IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>EARL THOMAS "DUTCH"<br>SIMPSON,<br><br>　　　　　Defendant. | CR 20-56-BLG-SPW<br><br>ORDER |

Before the Court is Defendant Earl "Dutch" Simpson's Motion to Suppress on the basis that law enforcement officers entered his home without a warrant, consent, or exigency. (Doc. 44). The United States concedes that the officers did not have a warrant and that there were no exigent circumstances that would allow entry but contends that the officers entered the home with the consent of resident Heather Wilson. (Doc. 49). The Court held a hearing on the Motion on November 12, 2021. (Doc. 53). At the hearing, four witnesses testified: BIA social workers Daniell Breland and Althea Foote, Officer Brandon Mikkanen, and Heather Wilson. At the conclusion of the hearing, the Court requested supplemental briefing; on November 19, 2021, each party submitted additional briefs. (Doc. 55 and 56).

I.  **Background**

The following facts were testified to at the November 12 hearing. On January 17, 2019, the social services office on the Northern Cheyenne Reservation received a report regarding a potentially dangerous situation involving illegal drugs, firearms, and the presence of children at Simpson's residence. Social workers Breland and Foote were assigned to conduct a welfare check, and they requested and received a tribal police dispatch, as they customarily did when calls involved weapons and dangerous drugs. Several officers arrived at the scene. Breland recalled the incident happening in the morning, while all other witnesses remembered it taking place early to mid-afternoon.

A group of people went to the porch of the home and approached the door. All four witnesses testified to a different number of officers who approached. Every witness agreed that at least Breland, Foote, and Mikkanen went to the door. Mikkanen remembered another officer approaching with him; Foote recalled at least two police officers on the porch in front of her in addition to Mikkanen; and, Wilson stated that four police officers accompanied the social workers to the door.

Similarly, the witnesses each recalled the conversation at the door differently. Breland said that, after she knocked on the door twice, Wilson answered. Breland explained the nature of the welfare check and that officers needed to enter the home to ensure the children weren't present. Breland did not

tell Wilson that they would search the home. Breland said that Wilson was "upset" and was hesitant to let them in. Wilson eventually let her and the others in. Wilson was never asked to sign a consent form and the conversation was apparently not recorded.

Officer Mikkanen remembered some details differently. He remembers both he and another officer knocking on the door. After Wilson answered, he said that she only momentarily paused before stepping aside and letting the officers and social workers into the home. He did not recall blocking the doorway or Wilson trying to shut the door. He stated that he did not specifically ask Wilson if she consented to allow the officers into the home and to search.

Foote remembered standing behind the officers and Breland and that they were all crowded around the door. She remembered an officer knocking several times and that the group was nearly leaving the porch when Wilson finally answered. She testified that Wilson didn't want to let them in and looked like she wanted to close the door on the officers but was stopped from doing so when an officer put his hand on the door to keep it open. From her positioning, Foote said she could not hear any details of the conversation between Wilson and the others.

Wilson testified that she was folding laundry in her basement when she heard someone "violently" knocking on the door repeatedly. When she came upstairs, she recalled seeing six people on the porch and that she was "alarmed"

and "afraid" because several of them were police. She remembered someone on the outside opening the door as she walked toward it and denied opening it herself. After the door opened, she recalled telling the officers and social workers that the children were at school and remembered initially telling them "no" when the officers asked to come inside and that she had to physically position herself in the doorway to keep them from entering. She remembered Officer Mikkanen becoming "clearly irritated" at her refusal to allow them into the home. She then stated that she tried to close the door but Mikkanen stopped her from doing so and that the officers pushed into the home. She thought the conversation on the porch went on for five to ten minutes. Wilson denied that she ever gave affirmative permission to any of the people on the porch that they could enter the home and that she never implicitly, through body language or nonverbal gestures, gave the impression that she was allowing them into the home.

## II.   Analysis

Ordinarily, voluntary consent to a search allows the state to search places and things normally protected by the Fourth and Fourteenth Amendments. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248 (1973). For consent to effectively waive those protections, consent to search must not be the result of express or implied duress or coercion. *Id.* at 248-49. It is the government's burden to show consent was given freely and voluntarily. *United States v. Chan-Jimenez*, 125 F.3d

1324, 1327 (9th Cir. 1997). The Ninth Circuit uses five factors to examine the voluntariness of consent:

> (1) Whether the defendant was in custody; (2) whether the arresting officers have their guns drawn; (3) whether *Miranda* warnings have been given; (4) whether the defendant was told he has a right not to consent; and (5) whether the defendant was told a search warrant could be obtained.

*United States v. Russell*, 664 F.3d 1279, 1281 (9th Cir. 2012). No factor is dispositive and the Court must also consider the totality of the circumstances. The fact that some of these factors are not met does not mean consent was voluntary. *United States v. Morning*, 64 F.3d 531, 533 (9th Cir. 1995). A review of these factors favors a finding that consent was not voluntarily given.

Considering the first factor, seizure of a person occurs when, accounting for the situation surrounding the police conduct in its entirety, the conduct communicates to a reasonable person that they are not free to ignore the police and continue with their day. *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004). The Ninth Circuit has further determined several factors useful to identify whether an individual's liberty is restrained such that they are in custody:

(1) The number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee of their right to terminate the encounter.

*United States v. Brown*, 563 F.3d 410, 416 (9th Cir. 2009).

Here, a reasonable person would not necessarily believe that she was free to do as she pleased. As many as six agents of the state stood on Wilson's porch. At least four officers entered the home. No weapons were alleged to have been brandished at her. The encounter occurred at a private residence, supporting a finding that Wilson was in custody. Officers implied that compliance would be compelled by stating they were there to search the home, rather than asking, and officers did not advise Wilson that she could terminate the encounter. However, no evidence was presented that Wilson believed she was in custody or was restrained. Taken as a whole, the analysis narrowly favors a finding that Wilson was not in custody when she was asked to consent.

Officers are not alleged to have drawn their weapons while asking Wilson for her consent. *Miranda* warnings were not supplied, but they were not required in such a circumstance because Wilson was not under arrest, so their absence

weighs against neither party. *Russell*, 664 F.3d at 1281. Wilson was not informed that she could refuse consent and could withdraw her consent at any time, weighing against a finding of voluntariness. Finally, officers did not tell Wilson they would simply obtain a warrant if she did not consent, favoring the government's position.

Taken in totality, the Court notes some mitigating circumstances but recognizes several factors that lean toward finding consent was not freely given. A fleet of officers descending on a private home is inherently coercive. *Orhorhaghe v. INS*, 38 F.3d 488, 494-95 (9th Cir. 1994). Officers apparently made no attempt to inform Wilson that she had the opportunity and right to refuse them entry. Officers physically blocked the doorway. There was conflicting testimony from witnesses about whether officers asked Wilson if they *could* enter or told her they *would* enter the home to check for the children. The government bears the burden of proving that the consent was, in fact, freely and voluntarily given. *Johnson*, 875 F.3d at 1276. The Court finds that the government has failed to meet that burden here. Therefore, because officers did not have consent, a warrant, or an exigent circumstance, the evidence discovered in the home must be suppressed.

III.  Conclusion

For the reasons stated above, the Defendant's Motion to Suppress (Doc. 44) is GRANTED.

DATED this 21st day of December 2021.

*Susan P. Watters*
SUSAN P. WATTERS
United States District Judge